UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
NORTHERN DIVISION

KYLE KENNARD,

                Plaintiff,                           Case No. 11-cv-15079

v.                                                        Honorable Thomas L. Ludington

MEANS INDUSTRIES, INC.,

                Defendant.

_____/

## ORDER DENYING MOTION FOR RELIEF FROM JUDGMENT, DENYING MOTION TO REVERSE, GRANTING MOTION TO AFFIRM, AND AFFIRMING THE DECISION OF THE PLAN ADMINISTRATOR

The substantive question posed by Plaintiff Kyle Kennard's immediate motion is not particularly complex. But the procedural history of the case and, to some extent, the underlying facts are. Kennard was a long-term employee of Defendant Means Industries, Inc. who was injured on the job in 1990. In 2011 Kennard sought disability benefits from his Long-Term Disability Plan and was denied benefits because the Plan Administrator determined that he was not totally disabled from engaging in any employment. This Court agreed but the Sixth Circuit disagreed, finding that he was disabled because there were no jobs within the national economy meeting his limitations. The Sixth Circuit remanded to this Court, which in turn remanded to the Plan Administrator who, accepting the Sixth Circuit's decision that Kennard was disabled within the meaning of Means' Plan, nevertheless found that Kennard was still not entitled to a benefit because he had received a workers' compensation benefit from Means that was coordinated with his long-term disability benefit. Kennard disagrees, contending that he is entitled to both benefits. Now, the procedural posture of the case should be explained.

The immediate motion before the Court is Kennard's December 11, 2014 Motion for Relief from this Court's Order and Judgment Entered on June 26, 2014 finding Kennard disabled

under the Means' Industries, Inc. Long-Term Disability Plan but remanding the matter to the Plan Administrator for a determination of Kennard's benefit. ECF No. 85. Kennard seeks relief under Federal Rule of Civil Procedure 60 from the judgment that was entered after this case was remanded from the Sixth Circuit. *Id*. Defendant Means Industries responded claiming that the requested relief is untimely. ECF No. 86. The Plan Administrator determined that Kennard was not entitled to a benefit payment because of the workers' compensation benefit coordination provision in the Plan. The motion also follows Kennard's effort to obtain a writ of mandamus from the Sixth Circuit vacating the June 26, 2014 Opinion & Order and Judgment. Kennard argued that mandamus was appropriate because the Sixth Circuit had directed this Court to make its own benefit calculation, not remand to the Plan Administrator.

The Sixth Circuit denied mandamus and noted that Kennard still had avenues of relief available for review of the Plan Administrator's decision. For the sake of completeness, the Court directed supplemental briefing after the case returned from the Sixth Circuit. The purpose of the supplemental briefing was to address the parties' differing interpretations of the Sixth Circuit's remand. Again, the resulting question is whether the Plan Administrator's decision that Kennard is not entitled to a benefit payment due to the Plan's offset of his workers' compensation settlement amounts was a reasonable interpretation of the Plan. If the Plan Administrator did not act arbitrarily or capriciously in applying the workers' compensation coordination provision, the Plan Administrator's decision should be affirmed and judgment entered against Kennard. If the Plan Administrator did act arbitrarily and capriciously, appropriate relief—possibly including remand—must be decided.

As set forth below, the Plan Administrator did not act arbitrarily or capriciously in determining that Kennard was not entitled to a disability benefit payment under the Plan.

Judgment will be entered against Kennard and the Plan Administrator's decision will be affirmed.

## I.

### A.

Kennard began working for Means in 1983 and was employed there for over 20 years. In 1990, he suffered a severe injury to his lungs when he was exposed to an improperly mixed batch of synthetic oil. Kennard later began suffering from headaches and a range of respiratory symptoms following his exposure to the oil.

Rendered ultra-sensitive to airborne pollutants due to this incident, Kennard received a life-long restriction to work in a clean-air environment. Means provided Kennard a clean-air environment, beginning in March 1992, when he returned to work.

In 1999, Kennard filed a Michigan Workers' Compensation Act and Americans with Disabilities Act claim contending that during the eight years he continued to be employed by Means the company discriminated against him because of his injury. He argued that other employees received pay increases that he did not. In March of 2000, an agreement was reached and Kennard was paid $24,000 and given certain work-related commitments by Means to accommodate his lung injury.

Beginning in 2005 Kennard alleges that Means required Kennard to punch in and out on a time clock in Means' plant, which was not located in a clean air environment. Due to this exposure, he alleges he became increasingly ill and was forced to miss work. Eventually Kennard was laid-off during a reduction in force. He nevertheless sought workers' compensation benefits for the earlier injury. Means ultimately redeemed Kennard's past and future claims to workers' compensation benefits for $220,000.

On May 29, 2007, Kennard also sought Social Security Disability (SSD) benefits, alleging that he was disabled as of February 14, 2006. After a hearing before the Honorable Joanne E. Adamczyk, the Social Security Administration found Kennard totally disabled in a decision dated October 6, 2009 because "there are no jobs in the national economy that [Kennard] could perform." First A.R. 106, ECF No. 49. Based on this finding, he then applied for disability retirement benefits under the Plan, which is governed by ERISA.[1]

Section 2.3 of the Plan provides that an employee "who shall have become, through some unavoidable cause, permanently disabled and who at such time shall be an Eligible Employee shall be eligible for a disability benefit." First A.R. 22, ECF No. 49. Section 2.3 then defines "permanent disability" under the Plan:

> A Participant shall be considered to be permanently disabled (as "permanently disabled" is used herein) only:
> (a) if he has been totally disabled by bodily injury or disease so as to be prevented thereby from engaging in any occupation or employment for remuneration or profit, and which condition constitutes total disability under the federal Social Security Act; and
> (b) after such total disability shall have continued for a period of six consecutive months and, in the opinion of a qualified physician chosen by the Committee (subject to Section 11), it will be permanent and continuous during the remainder of his life.

*Id*. According to the Plan's summary description, to qualify for disability retirement, "a physician selected by the Plan Administrator must determine that [the] disability totally and permanently prevents [an employee] from engaging in any occupation or employment." *Id*. at 5.

**B.**

One month after Kennard submitted his long-term disability request form, Means' Senior Human Resources Director Joyce Hynes scheduled examinations with two doctors to review his alleged disability. *See id*. at 89. The appointments were with Dr. Gerald Levinson, D.O. on

---

[1] Neither party disputes the fact that Means' employee benefit plan is governed by ERISA.

- 4 -

December 3, 2009, and Dr. Michael Holda, M.D. on December 10, 2009. Kennard was encouraged to "have any medical records with tests, etc." sent to the doctors before the appointments.[2] *Id*.

Kennard was examined by Dr. Levinson on December 3 in Southfield, Michigan. Following the examination, Dr. Levinson authored a report in which he concluded:

> [Kennard] is permanently and totally medically disabled from his usual and customary employment at Means Industries on the basis of occupational asthma as described above. However, he is employable as long as he could be guaranteed that he would be placed in an absolute clean air environment with absolutely no noxious fumes or inhalants, as he is sensitive to this. If that criteria could be met, then he could be employable in a clerical position.

*Id*. at 88. Kennard was examined by Dr. Holda one week later in Flint, Michigan. After that examination, Dr. Holda authored his report. He recommended that Kennard "be restricted from repetitive bending and twisting at the waist and lifting over 25 pounds" with "no prolonged sitting, standing." *Id*. at 81. Dr. Holda did not conclude that Kennard could not work.

On the basis of Dr. Levinson's and Dr. Holda's medical examinations and reports, and in accordance with Plan terms, Means' Plan Administrator, Edward Shemanski, determined that Kennard was not permanently disabled. *See id.* at 73. On February 26, 2010, Mr. Shemanski sent Kennard a letter indicating that his "disability pension request" had been denied. *Id*. Specifically, Mr. Shemanski discussed the applicable Plan provision (2.3), outlined Dr. Levinson's and Dr. Holda's findings, and indicated that "[o]n the basis of your recent medical examination and in accordance with Plan terms, we have determined that you are not permanently disabled within the meaning of the Plan." *Id*. at 73–74.

---

[2] Apparently, Dr. Levinson was intended to examine Kennard's lungs, while Dr. Holda was intended to assess previous reports of back pain. *See* Admin. R. 89 (requesting that Kennard send medical records concerning his lungs to Dr. Levinson and medical records concerning his back to Dr. Holda). However, Kennard maintains that "[t]he opinion of Dr. Holda . . . is a red herring. [Kennard] is not claiming total disability based [sic] orthopedic claims. The disability is the result of longstanding occupational asthma. . . . Dr. Holda's opinion is not germane to the issues on appeal." Pl.'s Resp. 3.

**C.**

On September 22, 2011, Kennard filed this case in Michigan's Saginaw County Circuit Court, claiming that Means denied his benefits claim in violation of both ERISA and Michigan's Workers Disability Compensation Act (WDCA). In that way the case was unusual: combining an ERISA action with a state-law claim. On November 17, 2011, Means removed the action to this Court. The Court later granted Means' partial motion to dismiss, as Kennard had previously acknowledged that "his state law claim for wrongful retaliation under the Michigan Workers Disability Compensation Act is preempted" by ERISA. *Id.* at 7 (quoting Pl.'s Resp. Mot. Dismiss 1).

On February 25, 2013, both Kennard and Means filed motions regarding the plan administrator's decision: Kennard to reverse, Means to affirm. The same day, Means filed the administrative record on the docket. On March 18, both parties responded to the other's motion.

**D.**

Judgment was first entered in this case on June 13, 2013. ECF No. 62. Judgment was entered following entry of an Opinion & Order granting Means' motion to affirm the determination of the plan administrator that Kennard was not disabled under the Long Term Disability Plan. *See* ECF No. 61. Kennard timely appealed that decision to the Sixth Circuit. ECF No. 63. The Sixth Circuit issued an opinion on February 12, 2014 reversing this Court's decision because it found that Kennard was completely disabled within the meaning of the Plan and that no jobs existed which Kennard was able to perform. The Sixth Circuit remanded the case "with instructions to award Kennard disability benefits, retroactive to the date they accrued under the Plan, and to consider his request for attorney fees and costs under 29 U.S.C. § 1132(g)(1)." ECF No. 65 at 6.

Following remand from the Sixth Circuit, the parties each moved for entry of judgment. *See* ECF Nos. 66 & 69. On June 26, 2014, this Court entered judgment in favor of Kennard, consistent with the Sixth Circuit's mandate and remanded the case to the plan administrator for a calculation of the benefits owed Kennard, retroactive to the date they accrued. ECF Nos. 76 & 77. On remand, the plan administrator determined that even if Kennard was disabled, as the Sixth Circuit had determined, the workers' compensation coordination provision in the plan applied to Kennard. Thus, the Plan Administrator determined that the workers' compensation payments Kennard was receiving from Means were to be coordinated, resulting in a complete set-off to any disability benefits. The Plan Administrator thus found that Kennard was not entitled to a disability benefit in addition to the workers' compensation benefit.

### E.

On July 24, 2014, following the determination by the Plan Administrator that Kennard was not entitled to receive any disability payments under the Plan, Kennard filed a motion for attorney fees, costs, and interest. ECF No. 78. Then, on July 28, 2014, Kennard filed a petition for a writ of mandamus with the Sixth Circuit. In his motion for attorney fees and his petition for a writ of mandamus Kennard argued that this Court erred in allowing the plan administrator to calculate his benefits and address the worker's compensation coordination provision, rather than simply awarding him full benefits retroactive to when they accrued. Consideration of Kennard's motion for attorney fees was stayed when the Court was informed of his petition to the Circuit. ECF No. 83.

### F.

On December 4, 2014, the Sixth Circuit denied Kennard's petition. The Sixth Circuit held that Means had not waived the workers' compensation coordination provision by denying benefits based on its conclusion that Kennard was not disabled. Accordingly, it was not an abuse

of discretion to remand to the Plan Administrator for the calculation of benefits. ECF No. 84 at 2-3. In particular, the Sixth Circuit noted that mandamus is an extraordinary remedy that "is not available if the petitioners have adequate alternative means to obtain the relief they seek." *Id*. at 2 (internal quotation marks omitted). "Kennard has, or had, an opportunity to seek judicial review of [the] ruling" that he "is not entitled to any payment under the plan due to a set-off of worker's compensation benefits he had previously received." *Id*.

**G.**

After the Sixth Circuit's opinion on the petition for mandamus was issued, Kennard filed the immediate motion for relief from the Court's June 26, 2014 Order and Judgment which remanded the case to the Plan Administrator for benefits calculation. ECF No. 85. In his motion, Kennard renews his assertion that the Court erred in remanding to the plan administrator for a calculation of benefits. *Id*. Kennard asked specifically that

> . . . the Court, now in receipt of the Plan Administrator's new Opinion and the Sixth Circuit's denial of Mandamus, enter a Final Judgment, modifying its prior Order and reject the Plan Administrator's new findings that are arbitrary and capricious, a result of neglect, inadvertence, and/or fraud and that would be inequitable to enforce.

*Id*. at 10. Kennard also renewed, within his motion for relief from judgment, his pending motion for attorney fees and costs. *Id*. at 11.

Defendant Means, in response to Kennard's motion, asserted that any claim under Rule 60 is meritless and possibly time-barred. ECF No. 86.

**H.**

After Kennard filed the motion for relief from judgment, the Court concluded that there was no final judgment from which Kennard could actually seek relief. Rather, as the Sixth Circuit had emphasized, Kennard had the ability to seek judicial review of the Plan Administrator's ruling that he was entitled to benefits, but no benefit payments. Instead of

attempting to navigate the procedural circumstances of the motions, the Court directed the parties "to file an administrative record constituting the record upon which the Plan Administrator relied in arriving at Kennard's benefits calculation." Order of January 14, 2015, ECF No. 87 at 5. The parties were further instructed "to file supplemental briefs addressing the propriety of the Plan Administrator's calculation of benefits and whether that calculation constituted an abuse of discretion warranting relief from this Court." *Id*. Those briefs, in conjunction with Kennard's prior motion for relief from judgment, will be construed as cross-motions to reverse or affirm the Plan Administrator's calculation determination.

In the Court's Order of January 14, 2015, the case was also administratively reopened and Kennard's Motion for Attorneys' Fees was denied without prejudice until the matter was finally addressed on the merits.

The Administrative Record was filed on January 29, 2015. Second Administrative Record, ECF No. 88. The parties filed their supplemental briefs—to be construed as motions to reverse and affirm—on February 12, 2015. Def.'s & Pl.'s Supp. Brs., ECF Nos. 89 & 90. The matter is now ready for review. Because the Plan Administrator did not act arbitrarily or capriciously in calculating Kennard's benefit payment under the Plan, her decision will be affirmed and judgment entered against Kennard.

## II.

Generally, a denial of benefits is reviewed de novo by this Court "unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility benefits or to construe the terms of the plan." *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989). Here, the Plan's terms indicate that the administrator has discretionary authority "[t]o construe and interpret the Plan, decide all questions of eligibility and determine the amount, manner and time of payment of any benefits hereunder." Means Industries, Inc. Vassar Division

- 9 -

Paper, Allied-Industrial, Chemical and Energy Workers International Union, AFL-CIO, CLC, Local 6-358, Hourly Employees Retirement Plan, Effective April 14, 1998, AR 0040. Moreover, the parties stipulated that the Plan grants the administrator discretionary authority to determine eligibility for benefits or construe the terms of the Plan and, thus, the Court will review the determination under the arbitrary and capricious standard of review. Stipulation, ECF No. 15.

"The arbitrary and capricious standard is the least demanding form of judicial review of an administrative action." *Smith v. Continental Cas. Co.*, 459 F.3d 253, 259 (6th Cir. 2006). The plan administrator's decision will be upheld if it is the result of a deliberate, principled reasoning process and is rational in light of the plan's provisions. *Cooper v. Life Ins. Co. of N. Am.*, 486 F.3d 157, 165 (6th Cir. 2007). "But the arbitrary-and-capricious standard of review is not a 'rubber stamp [of] the administrator's decision.'" *Cooper*, 486 F.3d at 165 (quoting *Jones*, 385 F.3d at 661).

Despite stipulating that the arbitrary and capricious standard applies in this case, Kennard advances the argument, albeit indirectly, in his brief that the administrator's decision should be afforded less weight due to a conflict of interest. Pl.'s Supp. Br. 1, n.1, ECF No. 90. In his brief Kennard notes that his denial of benefits was "predictabl[e]" and includes a footnote with authority on when a Plan faces conflicts of interest. *Id*. A court must take into consideration the conflict of interest that arises when one entity is both the administrator and the insurer: "where there is a monetary incentive for the insurance company or its claims administrator to deny the claim, 'the potential for self-interested decision-making is evidence.'" *Rabuck v. Hartford Life and Acc. Ins. Co.*, 522 F. Supp. 2d 844, 872 (W.D. Mich. 2007) (quoting *University Hosps. of Cleveland v. Emerson Elec. Co.*, 202 F.3d 839, 846 n. 4 (6th Cir. 2000)). This consideration applies, however, only where there is "significant evidence" that the insurer was motivated by self-interest. *Peruzzi v. Summa Medical Plan*, 137 F.3d 431, 433 (6th Cir. 1998).

There is no "significant evidence" of self-interest in the present litigation. While Means both insures and administers the Plan, Kennard does not identify any evidence of self-interest other than the fact that his benefits calculation resulted in no monetary award. Accordingly, the Court will apply the arbitrary and capricious standard of review.

### III.

As noted above, this case concerns the proper interpretation of the Means Industries Employees' Retirement Plan. In particular, the parties dispute whether the plan provides for the coordination of the workers' compensation benefits Kennard received from Means. If the answer is yes, as Means contends, then Kennard is not entitled to pension fund disbursements pursuant to the plan's offset provision in addition to his workers' compensation benefit. If the answer is no, as Kennard contends, Means has improperly withheld retirement benefits to which Kennard is entitled.

### A.

At the outset, it is important to note that benefit coordination provisions are far from unknown provisions in the world of health, accident, and employee benefits. Plans commonly contain such provisions. *In re Unisys Corp. Long-Term Disability Plan ERISA Litig.*, 97 F.3d 710, 715 (3d Cir. 1996) (observing that "[b]enefit offsets are common features of LTD plans"). Even Social Security benefits are subject to a workers' compensation offset. *See* How Workers' Compensation and Other Disability Payments May Affect Your Benefits, SOCIAL SECURITY ADMINISTRATION (January 2011) http://www.ssa.gov/pubs/EN-05-10018.pdf. An individual receiving "a periodic benefit . . . on account of a total or partial disability under a law or plan of the United States, a State, a political subdivision, or an instrumentality of two or more of these entities" is amenable to having his Social Security Disability Income adjusted to reflect that separate periodic benefit. 20 C.F.R. 404.408(a)(2)(1).

The Plan contains such a provision, but the parties dispute the conditions under which the offset provision is triggered. The first relevant provision of the Plan is found in Section 2, the section governing employees and retirees' eligibility for a pension benefit. Subsection 2.3 governs the "Disability Benefit" and contains the language at issue. It reads, in relevant part:

> . . . Any amount paid to or on behalf of any Participant on account of injury or occupational disease causing disability in the nature of a permanent, including permanent partial, disability for which the Company is liable, whether pursuant to Workers' Compensation or Occupational Disease Laws (except fixed statutory payments for the loss of, or 100% loss of use of, any bodily member) or arising otherwise from the statutory and common law and any such payments on account of employment by an employer other than the Company and any disability payments in the nature of a pension under any federal or state law, shall be deducted from or charged against the amount determined in accordance with paragraphs 3.2(b) and (c).

Means Industries, Inc. Vassar Division Paper, Allied-Industrial, Chemical and Energy Workers International Union, AFL-CIO, CLC, Local 6-358, Hourly Employees Retirement Plan, Effective April 14, 1998, AR 0022. In turn, paragraphs 3.2(b) and (c) of Section 3 set forth the formulae for determining the amount of a benefit to which a retiree is entitled.

The dispute between the parties is a straightforward question of the interpretation of the language of the plan. Kennard argues that because Means disclaimed liability under the workers' compensation settlement agreement in the prior worker's compensation case, Means cannot now say they are "liable" under the terms of the Plan. Means, by contrast, contends that "liability" for purposes of the settlement agreement and "liability" under the disability plan refer to two different things. Namely, the liability language under the plan asks whether Means is liable or responsible for making payments to an employee "on account of injury or occupational disease causing liability", not whether Means was liable for those injuries as a matter of fault.

The language selected for the provision is not perfect. It is likely a result of Means' effort to head off any misinterpretation of silence in the Plan that it in turn was inundated with

dependent and subordinate clauses to meet that objective. This result comes at the expense of clarity. Despite the problems with the Plan's language, the interpretation of the Plan Administrator—that Section 2.3 provides for the offset of the settlement amounts—is not arbitrary or capricious.

Under the Plan Administrator's reading of the provision, the subject of the sentence at issue is "any amount paid". The parties agree that this "amount paid" may be offset against any disability benefit a retiree receives. The provision engendering controversy is the relative clause "for which the Company is liable". This clause, under the Plan Administrator's reading, relates back to the subject—"any amount paid". It does not refer back to the underlying action. The sentence read with the intervening language removed is as follows: "Any amount paid . . . for which the Company is liable . . . shall be deducted from or charged against the amount determined in accordance with paragraphs 3.2(b) and (c)." This reading does no disservice to the text nor does it distort the text's plain meaning. Rather, it is a reasonable and acceptable reading of the terms of the Plan.

Kennard argues that the interpretation of the Plan adopted by the Plan Administrator is arbitrary and capricious because the dependent clause "for which the Company is liable" more appropriately refers to another dependent clause in the provision. Under Kennard's reading, the provision at issue ties Means' liability to the retiree's "injury or occupational disease causing disability". Thus, Kennard's interpretation of the provision would read "Any amount paid to or on behalf of any Participant on account of injury or occupational disease . . . for which the Company is liable . . . shall be deducted from or charged against the amount determined in accordance with paragraphs 3.2(b) and (c)." While at odds with the Plan Administrator's interpretation of the Plan and not the likely intended interpretation of the text, Kennard's reading

of the provision is not irrational. But that is not the standard by which the Plan Administrator's decision is to be reviewed.

Under the arbitrary and capricious standard, the Plan Administrator's decision is to be affirmed if it is rational in light of the Plan's provisions. *Cooper v. Life Ins. Co. of N. Am.*, 486 F.3d 157, 165 (6th Cir. 2007). Indeed, "[w]here both the trustees of a pension fund and a rejected applicant offer rational, though conflicting, interpretations of plan provisions, the trustees' interpretation must be allowed to control." *Cook v. Pension Plan for Salaried Employees of Cyclops Corp.*, 801 F.2d 865, 870 (6th Cir. 1986) (quoting *Miles v. New York State Teamsters Conference Pension & Ret. Fund Employee Pension Ben. Plan*, 698 F.2d 593, 601 (2d Cir. 1983)) abrogation on other grounds recognized by *Aubrey v. Aetna Life Ins. Co.*, 886 F.2d 119, 121 (6th Cir. 1989). Because the Plan Administrator's interpretation of the offset provision is rational, it must be affirmed. Kennard makes no claims in his brief to overturn the Plan Administrator's calculation that her reading of the Plan's language was irrational or undeserving of deference.

**B.**

Kennard makes several additional arguments about why the Plan Administrator's interpretation of the plan is arbitrary and capricious. He claims that "the sole analysis of the [Plan Administrator's] Opinion" is contained in one short paragraph that reads: "Based on the foregoing workers' compensation offset, the precise value of disability retirement pension benefits you are entitled to under the Plan terms is zero ($0) because the offset exceeds your total monthly benefit." ECF No. 90 at 1 (quoting Benefits Decision Letter of July 15, 2014, AR 0239). Kennard either ignores the prior two paragraphs of the letter, which addresses his prior workers' compensation settlement payments, or he believes they do not apply. Those paragraphs explain how under two different interpretations of the facts (using two different workers' compensation

settlement amounts) Kennard would not be entitled to a disability benefit. The Plan Administrator's opinion is not, as Kennard claims, "devoid of any 'reasoned explanation' as to why there is an offset in this case[.]" ECF No. 90 at 2. The opinion, to the contrary, explains each relevant provision of the plan and then explains the reading of the Plan that the Administrator adopts. Nothing about the Administrator's reasoning is arbitrary or capricious.

Part of Kennard's argument is his displeasure with the Plan Administrator's lack of discussion of the settlement agreement between Kennard and Means that led to the offset. Kennard claims that:

> . . . [t]he conclusion lacks any explanation or discussion as to the specific language in the Release, where liability of Means is denied [and] . . . [t]he Opinion is contrary to the understanding of the parties placed on the Record and confirmed by all parties, as well as Magistrate Paul Purcell, that the Redemption would have no affect on vested pension benefits[.]"

ECF No. 90 at 2 (sic throughout). Yet the Plan Administrator would only discuss the liability waiver and Kennard's release of Means for any prospective liability if she read the plan to consider whether the liability waiver affected the payment of benefits. On the Plan Administrator's reading of the offset provision, Means' obligation to pay Kennard a workers' compensation benefit triggers the provision, not an admission of fault by Means.

Similarly, Means is not estopped from denying benefits simply because they stated during the workers' compensation benefit hearing that Kennard was not giving up vested pension rights. Kennard has given up no such rights. While he has a right to benefit payments under the Plan since he is a qualifying former employee, those benefits are calculated under the Plan and the Plan dictates that those benefits be coordinated with the workers' compensation benefits paid by Means. The Administrator's opinion is not arbitrary or capricious because discussion of Kennard's release terms or Means representations during settlement were omitted.

**C.**

Lastly, Kennard attempts to side-step the strictures of the arbitrary and capricious standard of review in two ways. First, Kennard argues that an administrator "does not have the authority to add eligibility requirements [to the Plan]. Thus an administrator acts arbitrarily/capriciously when its interpretation adds requirements not found in the Plan or is unsupported by federal common law." ECF No. 90 at 3 (quoting *Harrell v. Metro. Life Ins. Co.*, 401 F. Supp. 2d 802, 809 (E.D. Mich. 2005)) (sic to misquotations throughout and quotations marks omitted). *Harrell*, however, is clearly distinguishable. There, MetLife, the defendant-plan administrator, was attempting to avoid disability payments by arguing that plaintiff's drunk driving death was a form of "suicide, attempted suicide or intentionally self-inflicted injury while sane or insane." *Id*. at 809 (quoting plan) (internal quotation marks omitted). There was no evidence that plaintiff had suicidal intent and MetLife did not so argue. Rather, MetLife argued that plaintiff "intentionally inflicted an injury upon herself by engaging in risky behavior: drunken driving." *Id*. at 810. The court held that it would be unreasonable to read any of the plan exclusions as encompassing drunk driving since all of the exclusions MetLife attempted to utilize required an intent to harm. As a result, if MetLife's reading of the plan was adopted, it would create a plan eligibility requirement that did not previously exist.

Here, the only way in which the Plan Administrator's reading of the Plan creates a new eligibility requirement is if she accepts the proposition that Kennard's reading of the Plan is correct. The Plan Administrator's reading of the Plan does not, as did MetLife's reading of the plan in *Harrell*, read language out of the Plan or otherwise nullify explicit requirements in the Plan. Plaintiff's reliance on *Harrell* is misplaced.

Second, he argues that interpretations of the Plan must abide by "federal common law rules of contract interpretation[.]" ECF No. 90 at 3. Kennard cites to *Perez v. Aetna Life Ins. Co.*, 150 F.3d 550, 556 (6th Cir. 1998), which held: "[b]ecause the Plan is governed by ERISA, we

- 16 -

apply federal common law rules of contract interpretation in making our determination." But the Sixth Circuit's rule concerning plan interpretation from *Perez* did not address the review of a Plan Administrator's interpretation of the Plan. Rather, the Sixth Circuit was deciding what standard of review should be applied by the district court in light of the Plan's language. *Perez* is unhelpful to Kennard.

### IV.

Accordingly, it is **ORDERED** that Plaintiff Kyle Kennard's Motion for Relief Judgment, ECF No. 85, is **DENIED**.

It is further **ORDERED** that Plaintiff Kyle Kennard's Motion to Reverse the Opinion of the Plan Administrator, ECF Nos. 85 & 90, is **DENIED**.

It is further **ORDERED** that Defendant Means Industries, Inc.'s Motion to Affirm the Opinion of the Plan Administrator, ECF Nos. 86 & 89, is **GRANTED**.

It is further **ORDERED** that the opinion of the Plan Administrator is **AFFIRMED**.

Dated: July 7, 2015  s/Thomas L. Ludington
THOMAS L. LUDINGTON
United States District Judge

PROOF OF SERVICE

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on July 7, 2015.

s/Karri Sandusky
Karri Sandusky, Acting Case Manager